SACHS, District Judge.
Appellant Barclays American/Business Credit, Inc., a secured creditor of the debt- or, Standard Conveyor Company, seeks reversal of the district court’s[1] decision awarding the proceeds of an escrow account in part to Standard’s trustee in bankruptcy and in part to Berwald Investment Co., once a potential purchaser of real property owned by Standard. Out of a $99,000 deposit in the escrow account made by Ber-wald in anticipation of the real estate transaction, $61,234.69 had been returned to Berwald by the escrow agent after the transaction was aborted, and $36,826.20 remained in the escrow fund as accrued rents owed to Standard by Berwald under a lease agreement. For reasons stated below, we affirm the distribution of the funds ordered by the district court.
FACTUAL BACKGROUND
On October 28, 1981, Berwald and Standard executed three contracts relating to certain real property owned by Standard. In the lease agreement, Berwald committed itself to pay Standard rent of $5,005 per week for a rental term of seventeen weeks.[2] A lease and purchase agreement established a selling price of $1,750,000 for the property; a December 17, 1981, closing date was set, with purchase by Berwald contingent upon the availability of permanent and interim financing as described in detail in paragraph 7 of the contract. The Escrow Agreement for Advance Deposit of Rent served two related purposes. $99,000 was deposited by Berwald in the escrow account[3] as a rental advance and as a liquidated damages fund in the event of the buyer’s default under the purchase agreement. Standard, as lessor, was “empowered to withdraw and receive from such account the amount of the weekly base rent as such rent becomes due and payable.” If Berwald defaulted under the purchase agreement, Standard could claim “the entire balance of the principal and accrued interest then on deposit with the Escrow Agent” as damages for the breach.
The purchase agreement expressly provided that if the financial contingencies set forth in the contract were hot satisfied, Berwald had the option, upon written notice to seller, of terminating the agreement and of receiving a refund of all earnest money and of “the balance then in the rental advance escrow account.”[4] During the course of the lease term, negotiations to obtain the necessary financing for the purchase continued. The closing date was extended to December 24, 1981, as complicated financial arrangements were worked on further. On December 23, 1981, Ber-wald gave written notification of its intent to cancel the purchase agreement, as well as the lease, for the reason that “the contingency stated in Paragraph 7 cannot be satisfied.” Plaintiff's exhibit 17. Berwald also demanded return of the escrowed funds as provided for in the purchase agreement upon cancellation. At Ber-wald’s request, $61,234.69 was paid to Ber-wald by the escrow agent on January 6, 1982. The remaining funds in the escrow account ($36,826.20) were not claimed by Berwald because they purportedly represent rents due and owing Standard for the period of the lease term.
An involuntary petition in bankruptcy was filed against Standard on January 18, 1982. Barclays, by reason of a perfected security interest in all of Standard’s contract rights and general intangibles, claims a right to succeed to the debtor’s interest in the escrowed funds (both the amount *201 disbursed to Berwald and the amount remaining in the account). Specifically, appellant argues that Berwald’s December 23, 1981, cancellation constituted a breach and anticipatory repudiation of the purchase agreement thereby triggering the liquidated damages provision of the contract in favor of Standard. Berwald asserts that its cancellation was proper and that, therefore, it was entitled to the balance of the escrow fund minus the accrued rents owed to Standard. Regardless of the court’s resolution of the Berwald-Barclays dispute concerning breach of the purchase agreement, Standard’s trustee in bankruptcy, Brian F. Leonard, claims priority in the $36,000 plus in accrued rents on the ground that Barclays’ security interest does not cover this type of property under the Uniform Commercial Code.
CANCELLATION OF THE PURCHASE AGREEMENT
The priority battle for the $61,234.69 between Berwald and Barclays hinges on whether the financial contingencies of paragraph 7 of the purchase agreement were available on December 23, 1981, or were likely to be available the next day (the closing date). Appellant points to the testimony of Standard’s attorney in the real estate transactions, Richard Zehring, as evidence that appropriate financing was available on the date of cancellation and that Berwald had simply lost interest in making the real estate purchase at the agreed price. Zehring related to the bankruptcy judge that he had spoken with Berwald’s counsel on December 22 and 23, 1981 and had indicated “that it appeared to me that all of the parties had agreed to financing that I expected would be acceptable to the Berwalds.” Moreover, Zehring testified that despite his opinion that the financing obtained did comply with the terms of the purchase agreement, Berwald’s attorney had advised Zehring that his client was no longer willing to pay the $1.75 million purchase price.[5]
Although not expressly relying on the Zehring testimony as a basis for its conclusion, the bankruptcy court found that “in all likelihood satisfactory financing could have been secured had Berwald not interrupted the course of performance by transmitting a notice of cancellation of the contract.” Finding of Fact '# 19. Because of the purported availability of such financing and Standard’s willingness at all times “to consummate the sale of the real property,” the bankruptcy judge held that Berwald’s cancellation constituted an anticipatory repudiation of the purchase agreement giving rise to a breach of contract claim in favor of the seller, Standard. The funds in the escrow account, consequently, would represent liquidated damages that belong to Barclays as the seller’s secured creditor.
The district court reversed this finding of breach by Berwald, pointing out initially that the availability of financing comporting with the requirements of the purchase agreement (specifically, paragraph 7A) was the prerequisite for Berwald’s performance, not the likelihood of “satisfactory financing,” the terminology used by the bankruptcy judge. The district court then undertook a detailed comparison of the proposed interim financing presented to Ber-wald prior to its cancellation notice with the financing required under paragraph 7A(i) of the purchase agreement. Despite Zehring’s “conclusory statement” that the available financing complied with the terms of the purchase agreement, Judge Alsop concluded that the proposed interim financing, because of higher than required interest rates,[6] did not satisfy the contract and, *202 theréfore, Berwald was entitled to terminate the sale agreement.[7] Alternatively, even if Berwald’s cancellation notice is regarded as a repudiation, that repudiation “did not contribute materially to the failure of the financing condition.” Both parties, consequently, were discharged from their duty to perform the contract. See Restatement (Second) of Contracts § 255 Comment a (1981).
Barclays argues that the district court’s reversal of the bankruptcy judge’s finding on the financing question violates the clearly erroneous standard of review that must be applied to the latter’s factual determinations. We disagree. First of all, the bankruptcy court’s opinion does reveal some inexact analysis in substituting “satisfactory financing” for financing in conformity with the provisions of the purchase agreement. That contract makes clear that the right to cancel belongs to the buyer if “the contingencies listed in 7A(i)” are not satisfied. The district court properly undertook a review of the available financing as it compared with the specifics of paragraph 7A. Whether the bankruptcy court engaged in the same analysis is improbable, based on the language of its opinion.
Moreover, the attorney’s opinion that financing in conformity with the contract was presented to Berwald on December 28,1981, is plainly inconsistent with the fact that the interest rates proposed for the assumption of loan agreements were significantly higher than the rates required under paragraph 7A(i) of the agreement.[8] While this court can form no opinion on whether the interim financing as presented was the primary motivation for Berwald’s termination, the purchase agreement unequivocally gave the buyer the option to pull out of the real estate transaction if the available financing did not match the precise terms of paragraph 7A(i). Accordingly, we agree with the district court that Berwald’s December 23, 1981, cancellation letter did not constitute a breach of the purchase agreement.
Appellant’s argument that Berwald could not cancel until the December 24, 1981, closing date is also not well-taken. That Berwald engaged in good faith efforts to obtain conforming financing through December 22 or 23 is not seriously contested. Only when it became apparent the day before closing that the proposed financing did not satisfy the purchase agreement’s contingencies did Berwald exercise its contractual option. Unlike the situation described in § 255 of the Restatement (Second) of Contracts, Berwald’s December 23, 1981, cancellation did not materially contribute to the non-occurrence of a condition of one of the buyer’s duties — the availability of financing in conformity with the purchase agreement. We agree with the district court that the financial contingencies were unavailable on December 23 and that there was no reliable evidence of a realistic prospect for achieving these terms by the next day.
Appellant’s reliance on Zehring’s optimistic prediction is unsupported by oral or written evidence from the prospective lenders themselves that loans within the interest rates provided for in the contract were to be offered to Berwald. A lawyer is not a recognized prophet, especially where future events depend on the intentions of others. In addition, Zehring’s own December 29, 1981, letter to Berwald’s attorney describes the financing to which “all parties had reached agreement” on December 23, 1981; as pointed out ■ by the district court, this after-the-fact description “also *203 fails to comply with the terms of paragraph 7A(i)(c).”
Finally, if the provisions in the purchase agreement concerning the buyer’s option to cancel are construed to preclude cancellation until the expiration of the closing date, the stated right would lose some of its practical meaning. The contract elsewhere makes clear that consummation of the sale was contingent upon fulfillment of specific financing contingencies. See, e.g., first sentence of paragraph 7A. The termination option granted in paragraphs 7B and 13 adds real significance to the contract only if it is interpreted to permit Berwald to cancel as soon as it becomes apparent that conforming financing cannot be obtained. The buyer owed an obligation to act in good faith in seeking the required financing, but that duty did not extend to continuing rental payments and the incurring of other expenses through the day of closing once it became clear that prospective lenders would not offer loans matching the conditions agreed to in the contract.
In sum, we agree with the district court that no default occurred when Berwald exercised its right to cancel the contract on December 23, 1981.[9] Accordingly, Ber-wald, under the terms of the contract, was entitled to recover the balance in the escrow account less the amounts representing accrued rents owed to Standard under the lease.
ACCRUED RENTS
The district court concluded that its rejection of the breach of contract claim against Berwald was dispositive of Bar-clays’ claim to the $36,826.20 remaining in the escrow account. The court wrote that since the $36,826.20 cannot be characterized as liquidated damages, “that sum does not come within Barclays’ security interest in contractual rights and general intangibles. Instead, the sum remaining in the escrow fund represents accrued rents owed to Standard.' Accordingly, these sums belong to the debtor’s estate.” Both the bankruptcy court and the district court characterized the $36,000 as accrued rents. Although the terms of the Berwald-Stan-dard agreements permitted the lessor to withdraw from the escrow account the weekly base rent owed by the lessee “as such rent becomes due and payable,” such withdrawals by Standard were not made and rental payments amounting to the $36,-000 built up in the escrow fund.
Relying on Minn.Stat. § 336.9 — 104(j), the trustee contends that Barclays’ security interest[10] could not possibly include those sums in the escrow account representing accrued rents. That Uniform Commercial Code subsection excludes from Article 9 coverage transactions creating or transferring “an interest in or lien on real estate, including a lease or rents thereunder." (emphasis added.)
The Article 9 lease exclusion was the subject of In Re Bristol Associates, Inc., 505 F.2d 1056 (3rd Cir.1974). In that case, the debtor leased certain real property to the Commonwealth of Pennsylvania and subsequently assigned its interest in the lease to a bank as security for a loan. The bank failed to record the assignment pursuant to Article 9 filing requirements. In the *204 priority battle between the debtor’s receiver and the bank, the bank’s interest in the lease assignment would have been subordinate if that assignment was within the scope of Article 9 — since no perfection had occurred. Looking primarily to various treatises on the U.C.C., the Third Circuit concluded that § 9-104(j) demonstrates that “the intent of the Legislature was to exclude from the filing and perfection provisions of Article 9 the use of a lease as collateral for a loan.” See also Citizens Bank and Trust Co. v. Wy-Tex Livestock Co., 611 S.W.2d 168, 171 (Tex.Civ.App.1981) (“By using the words ‘including a lease or rents thereunder,’ the legislature made it abundantly clear that rents payable under a lease of real property were excluded from the operative effect of chapter nine of the Code.”)
In the present case, although no express assignment of rents under the lease was made by Standard, the Article 9 secured party here claims priority to accrued rents through its security interest. Barclays’ claim runs afoul of the statutory exclusion for interests in real estate leases and rents thereunder. While the drafters of the U.C.C. made clear that a security interest in an instrument is covered by the U.C.C. even if that instrument is secured by a real estate mortgage,[11] Barclays does not assert rights to the rent monies through any note or instrument. An Article 9 security interest in the underlying proceeds of a real estate lease — rents—is expressly precluded by U.C.C. 9-104(j).
Barclays emphasized at oral argument the fact that Standard had never demanded the withdrawal of the accrued rents from the escrow account; this omission allegedly means that Standard’s interest in those monies had not yet matured as anything other than a contract right. We find this characterization unpersuasive. Both the lease and escrow agreements gave Standard the right to withdraw the real estate rents from the escrow fund as each week’s payment became “due and payable.” Even though no withdrawals were made, we agree with the rulings below that the monies had acquired a character as accrued rents. As such, they could not be covered by Barclays’ Article 9 security interest. Barclays has not asserted rights to the rent monies by reason of any non-Article 9 security interest or mortgage obligation. For that reason, the $36,826.20 in accrued rents belongs to the debtor’s estate.
The judgment of the district court in favor of Berwald and the trustee, respectively, is affirmed.

. The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota.

. Lessee had the right "to extend the term of this lease for seventeen (17) one-week terms” if certain conditions were satisfied.

. Heritage State Bank of North St. Paul served as the escrow agent.

. “If Buyers cancel this Agreement due to the fact that the conditions to closing, or any of them, have not been satisfied, the $1,000.00 Earnest Money ... together with the balance in the rental advance escrow account as of the date of cancellation shall be refunded forthwith to Buyers, and neither Seller nor Buyers shall be liable for damages hereunder to the other.” Purchase Agreement, paragraph 13.

. The following exchange occurred on direct examination of Zehring:
Q. Are you aware of any facts that justified the cancellation of the agreement or the refusal to go forward with it on the part of Ber-walds?
A. It’s a difficult question to respond to, but generally, no. No, I think the deal could have gone through if the Berwalds had been interested.

. The proposed interim financing consisted of the assumption of three loans with interest rates of 15%, 20[3]/4% (5% over prime rate as of December 24, 1981) and an unknown rate, respectively. Paragraph 7A(i)(c) called for a loan in *202 the principal amount of $1,750,000 at 14% per annum interest.

. “The plain language of paragraph 7B indicates that Berwald had an option to terminate the purchase agreement if the financial exigencies were not satisfied.” Slip op at 8.

. These higher than expected interest rates plausibly suggest the reason for Berwald’s purported offer to buy the real property for $1,600,000— $150,000 less than the contract price. See December 29, 1981, letter from Zehring, plaintiffs exhibit 18. A higher interest rate would have to be taken into account by Berwald in determining an acceptable amount of principal to be borrowed.

. Appellant also contends that Berwald has admitted its wrongdoing by stipulating before the bankruptcy court to the following finding of fact: "On December 23, 1981, Berwald’s attorney, Larry Neilson, repudiated the purchase agreement by serving Standard’s attorney with notice of his election to cancel the contract.” Berwald argued both before the district court and this court that all it intended by the stipulation was to admit that it did send the December 23 letter to Standard. While use of the word “repudiated” was ill-advised, it is clear that Ber-wald never yielded to Barclays on the essential question presented here — whether the December 23 cancellation notice constituted a contract breach or default thereby triggering the liquidated damages provision of the purchase agreement.

. Barclays’ security interest in the debtor’s contract rights and general intangibles included ”[w]ithout limitation, good will, trademarks, trade styles, trade names, patents, patent applications, and deposit accounts whether now or hereafter created or required ... all accounts (as defined in the Accounts Receivable Rider) and other receivables whether now in existence or hereafter created." Bankruptcy court finding of fact # 2.

. "The application of this article to a security interest in a secured obligation is not affected by the fact that the obligation is itself secured by a transaction or interest to which this article does not apply.” Minn.Stat. § 336.9-102(3). See official comment # 4.